# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

BLANK ROME LLP
A Pennsylvania LLP
NICHOLAS C. HARBIST, ESQ. (NCH-7014)
New Jersey Resident Partner
LEV KALMAN, ESQ. (LK-3299)
Woodland Falls Corporate Park
210 Lake Drive East, Suite 200
Cherry Hill, New Jersey 08002
(856) 779-3600
MILLER, ALFANO & RASPANTI, P.C.
MARC S. RASPANTI, ESQ.
GAETAN J. ALFANO, ESQ.
1818 Market Street, Suite 3402
Philadelphia, PA  19103
(215) 972-6400
Attorneys for Plaintiff/Relator,
James T. Monahan

| | |
|---|---|
| James T. Monahan on behalf of the United States of America, | HON. JOSEPH A. GREENAWAY, JR. |
| Plaintiff/Relator, | |
| v. | CIVIL NO. 2:02CV05702 (JAG) |
| ▮ Raritan Bay Medical Center Capital Health System of Mercer, d/b/a Mercer Medical Center Inc., Liberty Health Systems d/b/a Jersey City Medical Center and Meadowlands Hospital Medical Center, Robert Wood-Johnson University Hospital d/b/a Hamilton Hospital Inc., Hackensack Medical Center, St. Peter's University Hospital, Newcomb Health Services Corp., d/b/a Newcomb Hospital, Rahway Hospital, ▮▮▮▮▮▮▮ St. Francis Medical Center-Trenton, Barnert Hospital, Deborah Heart and Lung Center, Bayonne Hospital, and Our Lady of Lourdes Medical Center, | **THIRD AMENDED QUI TAM COMPLAINT AND JURY DEMAND** **(FILED *EX PARTE IN CAMERA* AND UNDER SEAL)** |
| Defendants. | |

117394.00601/30325789v.1

Plaintiff, James T. Monahan ("Monahan"), hereby alleges, through his undersigned attorneys, by way of this Third Amended Complaint against Defendants, ███████████ Raritan Bay Medical Center, Capital Health System of Mercer, d/b/a Mercer Medical Center Inc., Liberty Health Systems d/b/a Jersey City Medical Center and Meadowlands Hospital Medical Center, Robert-Wood Johnson University Hospital, d/b/a Hamilton Hospital Inc., Hackensack Medical Center, St. Peter's University Hospital, Newcomb Health Services Corp., d/b/a Newcomb Hospital, Rahway Hospital, ███████████████████████████████████████████ ██████████████████████████████ St. Francis Medical Center-Trenton, Barnert Hospital, Deborah Heart and Lung Center and Bayonne Hospital:

## INTRODUCTION

1.      JAMES T. MONAHAN ("Relator") brings this action on behalf of the United States of America against Defendants for treble damages and civil penalties arising from the Defendants' false statements and false claims in violation of the Federal False Claims Act, 31 U.S.C. §3729, *et seq.* ("FCA"). The violations arise out of the Defendants' false and fraudulent presentation of claims to Medicare and the TRICARE (f/k/a CHAMPUS) program and other government programs for cost outlier payments. The false and fraudulent claims submitted also arise out of the Defendants' violations of the federal anti-kickback statute, 42 U.S.C. §1320a-7b(b).

2.      As required by the FCA, 31 U.S.C. §3730(a)(2), the Relator has already provided to the Attorney General of the United States and to the United States Attorney for the District of New Jersey a statement of all material evidence and information related to this Third Amended Complaint. In addition, Relator has provided supplemental written materials to the Attorney General and the United States Attorney for the District of New Jersey.

2

3.      Relator is informed and believes that the pervasive false and fraudulent claims described herein began before he was made aware of them and continued up to and beyond the time the Relator filed his initial Complaint in this matter, on or about November 27, 2002.

## JURISDICTION AND VENUE

4.      Jurisdiction of this court over this action is invoked pursuant to federal question jurisdiction under 28 U.S.C. § 1331.  Plaintiff also brings this claim under 31 U.S.C. § 3730(b), the False Claims Act.

5.      Venue is appropriate in this district under 28 U.S.C. 139(b) and 31 U.S.C. § 3732(a) since the plaintiff resides in this district and the corporate defendants, ███████

███████ Raritan Bay Medical Center, Capital Health System of Mercer, d/b/a Mercer Medical Center Inc., Liberty Health Systems d/b/a Jersey City Medical Center and Meadowlands Hospital Medical Center, Robert Wood-Johnson University Hospital, d/b/a Hamilton Hospital Inc., Hackensack Medical Center, St. Peter's University Hospital, Newcomb Health Services Corp., d/b/a Newcomb Hospital, Rahway Hospital, ████████████████████████

████████████████████████████████ St. Francis Medical Center-Trenton, Barnert Hospital, Deborah Heart and Lung Center and Bayonne Hospital conduct business in this district, and claims arose in this district.

## THE PARTIES

6.      Plaintiff, James T. Monahan, resides in Little Silver, New Jersey.  Plaintiff has more than thirty years of experience in the healthcare field and, during that time, has held various high level executive positions and developed significant expertise and professional contacts in hospital financial management and hospital billing.  Plaintiff operates James T. Monahan and Associates, which is a financial management consulting company to the hospital industry, and

3

concentrates on start-up and turnaround assignments with particular emphasis on cost management.

7.      James T. Monahan is an "original source" of the information giving rise to the herein cause of action pursuant to 31 U.S.C.A. §3730(e)(4)(A) because he is "an individual who has direct and independent knowledge of the information on which the allegations are based.

8.      ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉

9.      Defendant, Raritan Bay Medical Center, is a New Jersey not-for-profit corporation with its principal place of business at 530 New Brunswick Avenue, Perth Amboy, New Jersey 08061.

10.     Defendant, Capital Health System at Mercer, d/b/a Mercer Medical Center Inc., is a New Jersey not-for-profit corporation with its principal place of business at 446 Bellevue Avenue, Trenton, New Jersey 08618.

11.     Defendant, Jersey City Medical Center, is a New Jersey not-for-profit corporation with its principal place of business at 50 Baldwin Avenue, Jersey City, New Jersey 07304, and is a member of Liberty Health Systems Inc.

12.     Defendant, Robert-Wood Johnson University Hospital d/b/a Hamilton Hospital Inc., is a New Jersey not-for-profit corporation with its principal place of business at 1 Hamilton Health Place, Trenton, New Jersey 08690.

13.     Defendant Meadowlands Hospital Medical Center, is a New Jersey not-for-profit corporation with its principal place of business at 55 Meadowlands Parkway, Secaucus, NJ 07094, and is a member of Liberty Health Systems Inc.

14.     Defendant, Hackensack Medical Center, is a New Jersey not-for-profit corporation with its principal place of business at 30 Prospect Avenue, Hackensack, New Jersey 07601.

15.     Defendant, St. Peter's University Hospital, is a New Jersey not-for-profit corporation with its principal place of business at 254 Easton Avenue, New Brunswick, New Jersey 08901.

16.     Defendant, Newcomb Health Services Corp., d/b/a Newcomb Hospital, is a New Jersey corporation with its principal place of business at 65 South State Street, Vineland, New Jersey 08360.

17.     Defendant, Wayne General Hospital Corp., is a New Jersey not-for-profit corporation with its principal place of business at 224 Hamburg Turnpike, Wayne, NJ 07470.

18.     Defendant, Rahway Hospital, is a New Jersey not-for-profit corporation with its principal place of business at 865 Stone Street, Rahway, New Jersey 07065.

19.     ████████████████████████████
████████████████████████████████████
████████████████████████████████
██████████████████████████████████
███████████████████████████████
████████████████████████████████
███████████████████████████
████████████

5

20.     Defendant, St. Francis Medical Center-Trenton is a New Jersey non-profit corporation with its principle place of business at 601 Hamilton Avenue, Trenton, NJ 08629-1986.

21.     Defendant, Deborah Heart and Lung Center, is a New Jersey non-profit corporation with its principle place of business at 200 Trenton Road, Browns Mills, NJ 08015.

22.     Defendant, Barnert Hospital, is a New Jersey non-profit corporation with its principle place of business at 680 Broadway, Paterson, NJ 07514.

23.     Defendant, Bayonne Hospital, is a New Jersey non-profit corporation with its principal place of business located at 29th Street at Avenue E, Bayonne, New Jersey 07002.

### The Regulatory Scheme for Hospital Billing of Outlier Payments

24.     Since the mid-1980s, hospitals throughout the United States have been generally reimbursed by Medicare for in-patient hospital services based upon Medicare's Prospective Payment System ("PPS"), which issues prospectively determined payments based upon diagnosis of a given patient, and are not based upon the actual length of stay or amount of services provided to each patient.

25.     The Medicare program assigns diagnosis related groups (or "DRG's") a particular weight by which a uniform federal rate is multiplied.  The more complicated and costlier the treatment is, the greater the weight to be assigned to that particular DRG.  Under the PPS, to calculate the final DRG prospective payment rate for a patient discharged, the Secretary of Health and Human Services takes the federal rate, adjusted according to a locality-based wage index, and then multiplies it by the weight assigned to the patient's DRG.  By statutory mandate, the Secretary must publish the weights and values that are to be factored into the prospective payment calculus before each fiscal year.  See 42 U.S.C. § 1395ww(d)(6).

6

26.    Congress recognized that healthcare providers would inevitably care for some patients whose hospitalization would be extraordinarily costly, lengthy or difficult. In order to insulate hospitals from bearing a disproportionate share of these atypical costs, Congress authorized the Secretary to make supplemental "outlier payments." Section 1886(d)(5)(A) of the Social Security Act  (42 U.S.C. § 1395ww(d)(5)(A)) provides the foundation for Medicare payments for "outlier" cases involving extraordinarily high costs for day outliers and cost outliers.

27.    A hospital can qualify for day outlier payment if the patient's length of stay exceeded the mean length of stay for that particular DRG by a fixed number of days or standard deviations. 42 U.S.C. § 1395ww(d)(5)(A)(i). The Secretary can make cost outlier payments when hospitals' cost-adjusted charges surpass either a fixed multiple of the applicable DRG prospective payment rate or other such fixed dollar amount that the Secretary establishes. 42 U.S.C. § 1395ww(d)(5)(A)(ii). Congress established that "outlier payments shall be determined by the Secretary and shall approximate the marginal cost of care beyond the cutoff point applicable" to the day or cost outlier under Clause (i) and (ii). 42 U.S.C. § 1395ww(d)(5)(A)(iii).

28.    Hospitals are permitted to request additional reimbursement for such outlier costs and the PPS is adjusted annually so that the amount of outlier costs reimbursed by Medicare to all hospitals in the aggregate remains between 5 and 6 percent of all PPS hospital reimbursement, including the outlier payments. 42 U.S.C. § 1395ww(d)(5)(A)(iv). According to the Medicare Intermediary Manual, § 3610.7(b), the Secretary's intent is to reimburse hospitals, in part, for expenses involved in caring for patients whose cases have an "exceptionally high cost," i.e.,

7

patients who require services substantially in excess of the averages utilized to arrive at the PPS payment levels.

29.     The Secretary has implemented these statutory requirements by setting forth a formula for payment of outlier cases in 42 CFR § 412.80 *et seq*. The Secretary described that the Social Security Act provides for payments in addition to Prospective Payments for "'outlier' cases; that is, cases involving extraordinarily high costs." 67 Fed. Reg. 90 (May 9.2002) at 31459 and 31509. According to the Secretary, to qualify for "outlier payments", a case must have "costs above a threshold amount". Id. at 31509.

30.     Section 412.80 provides for outlier payments, and states:

> CMS provides for additional payment, beyond standard DRG payments, to a hospital for covered inpatient hospital services furnished to a Medicare beneficiary if the hospital's charges for covered services, adjusted to operating costs and capital costs by applying cost-to-charge ratios, as described in § 412.84(h), exceed the DRG payment for the case…plus a fixed dollar amount (adjusted for geographic variation in costs) as specified by CMS.

42 C.F.R. § 412.80(a)(2).  Thus, eligibility for, and the amount of,  the cost outlier payments are determined through a multi-step process.

31.     First, the hospital calculates its total charges for the covered services, adjusted to operating costs and capital costs through the application of the cost-to-charge ratio.  This ratio is based upon the costs and charges reported by the hospital to the Medicare program.

32.     Second, the cost-to-charge ratio of the hospital is compared to maximum and minimum ratios determined by Medicare, and if the hospital's ratio exceeds the maximum or minimum amounts, a statewide average of cost-to-charge ratios is used in place of the hospital's actual cost-to-charge ration.  42 CFR § 412.84(h).

8

33.     If at the end of the calculation, an outlier payment is indicated, it is reduced, through a regulatory formula to a "marginal cost factor", to reflect the fact that certain fixed costs were not increased due to the expense of this particular case. 42 C.F.R. § 412.84(j).

34.     For Medicare purposes, charges are defined as "the regular rates for various services which are charged to both beneficiaries and other paying patients who receive the services. Implicit in the use of charges as the basis for apportionment is the objective that charges for services be related to the cost of services". 42 C.F.R. § 413.53. Further, the Medicare Provider Reimbursement Manual requires that "charges should be related consistently to the cost of services and uniformly applied to all patients whether inpatient or outpatient". PRM Part 1, Section 2202.4.

35.     The Medicare Provider Reimbursement Manual further states that "the Medicare charges for a specific service must be the same as the charges made for non-Medicare patients …and must be related to the cost of the service". PRM Part 1, Section 2204. While the PPS outlier rules require the use of hospital charges as part of determining the cost to charge ratio, the Medicare program rules specifically require that the charges be objectively reasonable in that such charges be related consistently to the costs of the services, and that the charges be uniformly applied to all patients, regardless of payor.

### The TRICARE Program

36.     TRICARE is the component agency of the U.S. Department of Defense that administers and supervises the health care program for certain military personnel and their dependents.

9

37.     TRICARE contracts with a fiscal intermediary that receives, adjudicates, processes and pays health care claims submitted to it by TRICARE beneficiaries or providers. The funds used to pay the TRICARE claims are government funds.

38.     TRICARE assigns a "provider number" to suppliers who wish to participate in the program.  In order to obtain reimbursement for services, the suppliers bill an insurance carrier designated by TRICARE, which insurance carrier in turn ultimately receives payment by funds from the United States.

39.     An explicit tenet of the TRICARE system is that its DRG-based payment system is modeled on the Medicare PPS, and that, whenever practical, the TRICARE system will follow the same rules that apply to the Medicare PPS.  See Civilian Health And Medical Program Of the Uniformed Services; Fiscal Year 2004 Diagnosis-Related Group Updates, 68 Fed. Reg. 206, 60970.

40.     The TRICARE program calculates outlier payments owed to participating hospitals and, through a fiscal intermediary, pays hospitals for cost outlier amounts.  See TRICARE Reimbursement Manual 6010.53-M, March 15, 2002.

41.     ███████████████████████████████

42.     ███████████████████████████████



117394.00601/30325789v.1



49.

50.

51.

53.



54.

55.

56.

13



57.

58.

59.

60.

61.

62.

14



63.

64.

65.

66.

67.

15



68. ████████████████████████████

69. ████████████████████████████

| Hospital | 2000 Outlier Revenue | 2001 Outlier Revenue | Percent Increase | 2001 Outlier % |
|---|---|---|---|---|
| ████████████ | ██████ | ██████ | ██████ | ████ |
| ████████████ | ██████ | ██████ | ██████ | ████ |
| ████████ | ██████ | ██████ | ██████ | ████ |
| ████████ | ██████ | ██████ | ██████ | ████ |
| Deborah Heart & Lung Center | $1,991,058 | $9,547,730 | 379.53% | 12.1% |
| Barnert Hospital | $1,312,086 | $5,227,046 | 298.38% | 37.4% |
| St Francis Med Ctr. – Trenton | $5,670,759 | $11,336,384 | 99.91% | 36.3% |
| Bayonne Hospital | $3,886,953 | $12,672,494 | 226% | 36.69% |

████████████████

16

## The New Jersey Hospitals Participating in the
## Outlier Fraud Scheme

70.     Based on an informed analysis of the Medicare cost reports, the Relator's inside

industry information and analyses and other available evidence, the defendant hospitals listed

below had outlier payments in excess of 15 percent of total revenue for fiscal years 1998 through

2001. The analysis is as follows:

| Hospital | 1999 Outlier Payment | 2000 Outlier Payment | 2001 Outlier Payment | Outlier Percent 1998 | Outlier Percent 1999 | Outlier Percent 2000 | Outlier Percent 2001 | Percent Increase 1998-1999 | Total Cost to Charge Ratio ('99) | Medicare Cost to Charge Ratio ('99) |
|---|---|---|---|---|---|---|---|---|---|---|
| Hackensack Medical Center | $19,343,306 | $31,822,160 | $35,188,949 | 15.59 | 15.03 | 23.77 | 22.98 | -3.59 | 0.2575 | .260 |
| Raritan Bay Medical Center | $11,894,381 | $14,944,182 | $25,985,474 | 16.95 | 23.15 | 28.08 | 38.54 | 36.58 | 0.2248 | .191 |
| Robert Wood-Johnson University Hospital – Hamilton | $10,271,120 | $18,122,337 | $16,202,187 | 35.76 | 38.62 | 48.05 | 41.01 | 8.00 | 0.2242 | .196 |
| St. Peters University Hospital | $6,749,736 | $9,529,627 | $16,780,187 | 13.95 | 15.11 | 21.19 | 31.88 | 8.32 | 0.3307 | .309 |
| Rahway Hospital | $5,471,463 | $3,616,522 | $5,329,088 | 13.66 | 17.67 | 12.01 | 19.31 | 29.36 | 0.3483 | .306 |
| Capital Health System of Mercer, d/b/a Mercer Medical Center Inc. | $4,328,658 | $2,585,959 | $3,419,809 | 11.85 | 19.19 | 13.41 | 23.77 | 61.94 | 0.2727 | .221 |
| Jersey City Medical Center | $3,495,535 | $3,139,691 | $1,653,485 | 16.18 | 25.76 | 22.22 | 14.19 | 59.21 | 0.3182 | .478 |
| Newcomb Hospital* | $2,485,262 | | | 15.58 | 16.78 | | | 7.70 | 0.3064 | .300 |
| Bayonne Hospital | $2,777,567 | $3,886,953 | $12,672,494 | 9.06% | 9.57% | 14.28% | 36.69% | 7.80 | 0.3785 | .335 |

**\* No longer in existence, now part of South Jersey Health Systems.**

## Acuity Rates

71.     Acuity is a quantitative measure of a hospital's consumption of resources relative

to the care it provides to its patients. Accordingly, the lower the acuity level for a particular

17

hospital, the fewer resources that hospital has consumed in treating its patients.  Conversely, a high acuity level indicates that a hospital has consumed a high level of resources in treating its patients.  The defendant hospitals listed in paragraphs 69-70 had acuity rates as follows:

| **Hospital** | **2000 Acuity** | **2001 Acuity** | **2002 Acuity** |
|---|---|---|---|
| Hackensack Medical Center | 1.7709 | 1.754172 | 1.736551 |
| Raritan Bay Medical Center | 1.2989 | 1.292847 | 1.285726 |
| Robert Wood-Johnson University Hospital | 1.2956 | 1.264783 | 1.290408 |
| St. Peters University Hospital | 1.4348 | 1.429312 | 1.383465 |
| Rahway Hospital | 1.3584 | 1.347131 | 1.338666 |
| Capital Health System of Mercer, d/b/a Mercer Medical Center Inc. | 1.3190 | 1.336509 | 1.366695 |
| Jersey City Medical Center | 1.4327 | 1.424325 | 1.325687 |
| Newcomb Hospital | 1.3090 | | |
| ██████████ | ███ | ███ | ███ |
| St. Francis Medical Center – Trenton | 1.6152 | 1.621772 | 1.649756 |
| Barnert Hospital | 1.2547 | 1.176867 | 1.260031 |
| Deborah Heart & Lung Center | 2.8413 | 2.828921 | 2.911722 |
| ██████████████ | ███ | ███ | ███ |
| ██████████ | ███ | ███ | ███ |
| ████████████ | ███ | ███ | ███ |
| Meadowlands Hospital | 1.2986 | 1.197828 | 1.263822 |
| Bayonne Hospital | 1.2073 | 1.177862 | 1.217992 |

18

**Statewide Average:**            1.3925         1.3858         1.4002

72.     According to analyses performed by the Relator, the defendant hospitals had low acuity rates and low case mix indexes.

73.     Accordingly, the defendant hospitals consumed a relatively low level of resources in their treatment of Medicare patients.  The high outlier payments received by the defendant Hospitals and their false and fraudulent charges to Medicare could not be and were not justified by relatively high costs of Medicare patient treatment or long hospital stays.

74.     Raritan Bay Medical Center's ("Raritan") policy is that each time Raritan gets a new cost to charge ratio for use in billing, it increases its charges in order to recoup higher outlier payments.

75.     ████████████████████████████████████████████████
████████████████████████

76.     Based on information received by Relator, many of the defendant hospitals have charged and are charging Medicare patients more for treatment than non-Medicare patients.  The higher charges to Medicare than to non-Medicare patients were submitted in an effort to receive high cost outlier payments from Medicare and in violation of Medicare regulations requiring all patients to be charged alike.

77.     In an effort to decrease the amount of income traceable or identifiable as being received from outlier payments, some or all of the defendant hospitals engaged in a reallocation in their financial statements where amounts listed for bad debt and other reserves were artificially inflated in order to give the false impression of a stable level of net income and profit.

78.    The defendant hospitals that engaged in the artificial reallocation of their bad debt and other reserves did so with the intent of deceiving their investors, auditors or the United States Government and hiding the true amount of outlier income they were receiving.

79.    The artificial reallocation of bad debt reserves by the defendant hospitals was performed in an attempt to make it appear that they were receiving less net income than they actually were and in an effort to distract auditors and other government investigators from their excessive outlier income.

80.    Accordingly, the defendant hospitals may have, in actuality, received substantially greater outlier income than was reported by them in their financial statements.

81.    Based on artificially inflated charges, not consistently related to costs, the defendant hospitals submitted bills to CMS requesting outlier payments. The request for outlier payments are false and fraudulent, in that the charges are not consistently applied to all payers and the charges have no accurate or legitimate relationship to actual costs incurred.

82.    The charges listed by the defendant hospitals and submitted to Medicare are fraudulent because they are not reasonably related to costs, are not uniformly applied to all patients, and do not reflect negotiated discounts traditionally given to other payers. Indeed, the sole reason the defendant hospitals inflated charges to Medicare and other federal government agencies was to obtain outlier payments to which they were not legally entitled.

83.    Because the defendant hospitals discount charges to private insurers but not to Medicare, the high cost outliers charged to Medicare are artificial and inflated and evidence an even greater abuse by the defendant hospitals in their charges to Medicare. Indeed, the high cost outliers charged to Medicare cannot be accurately compared to the charges for private payers because the stated charges to private payers do not reflect their negotiated discounts.

117394.00601/30325789v.1

## COUNT ONE

84.     Plaintiff incorporates all preceding allegations of this Third Amended Complaint as if fully set forth at length herein.

85.     In furtherance of the outlier revenue fraud scheme, from in or about 1996 through in or about the present, Defendants knowingly presented, or caused to be presented to CMS, formerly known as the Healthcare Financing Administration, false and fraudulent claims for payment; and made, used, or caused to be made or used, false or fraudulent records or statements to get a false or fraudulent claim paid, all in violation of 31 U.S.C. Section 3729(a)(1) and (2).

86.     As a result of the revenue fraud scheme, the Defendant hospitals defrauded the Department of Health and Human Services and the taxpayers of the United States out of hundreds of millions of dollars in outlier payments to which the defendants were not otherwise entitled.

**WHEREFORE**, Plaintiff, James T. Monahan, acting on behalf of the United States of America demands that defendants ▮▮▮▮▮▮▮▮ Raritan Bay Medical Center, Capital Health System of Mercer, d/b/a Mercer Medical Center Inc., Liberty Health Systems d/b/a Jersey City Medical Center and Meadowlands Hospital Medical Center, Robert Wood-Johnson University Hospital, d/b/a Hamilton Hospital Inc., Hackensack Medical Center, St. Peter's University Hospital, Newcomb Hospital, Rahway Hospital, ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ St. Francis Medical Center-Trenton), Liberty Medical Systems d/b/a Jersey City Medical Center and Meadowlands Medical Center, ▮▮▮▮▮▮▮▮ Barnert Hospital, Deborah Heart and Lung Center and Bayonne Hospital pay the United States of America the penalty of not less than $5,500 and not more than $11,000 per each False Claims Act violation, three times the amount of damages which the United States of America has sustained because of the violation of the False Claims

21

Act, plus litigation and investigation costs and reasonable attorneys fees, and other such relief as the court deems appropriate.

## COUNT TWO

87.     Plaintiff incorporates all preceding allegations of this Third Amended Complaint as fully set forth herein.

88.     Beginning in or about 1996 through in or about the present in the District of New Jersey and elsewhere, Defendants ▮▮▮▮▮▮▮ and others known and unknown, did knowingly conspire, combine, collude and agree to file and fraudulent claims for payment with the CMS and did use false records or statements to get a false or fraudulent claim paid, all in violation of 31 U.S.C. § 3729(a)(3).

89.     As a result of the cost outlier fraud conspiracy, Defendant hospitals defrauded the Department of Health and Human Services and the taxpayers of the United States out of hundreds of millions of dollars in outlier payments to which Defendants were not otherwise legally entitled.

**WHEREFORE,** Plaintiff, James T. Monahan, acting on behalf of the United States of America demands that defendants ▮▮▮▮▮▮▮ Raritan Bay Medical Center, Capital Health System of Mercer, d/b/a Mercer Medical Center Inc., Liberty Health Systems d/b/a Jersey City Medical Center and Meadowlands Hospital Medical Center, Robert Wood-Johnson University Hospital, d/b/a Hamilton Hospital Inc., Hackensack Medical Center, St. Peter's University Hospital, Newcomb Hospital, Rahway Hospital, ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ St. Francis Medical Center-Trenton), Liberty Medical Systems d/b/a Jersey City Medical Center and Meadowlands Medical Center, ▮▮▮▮▮▮ Barnert Hospital, Deborah Heart and Lung Center and Bayonne Hospital pay the United States of America the penalty of not less than $5,500 and

22

not more than $11,000 per each False Claims Act violation, three times the amount of damages

which the United States of America has sustained because of the violation of the False Claims

Act, plus litigation and investigation costs and reasonable attorneys fees, and other such relief as

the court deems appropriate.

## COUNT THREE

### Violations of the Federal Anti-Kickback Statute as Violations of the False Claims Act – 42 U.S.C. §1320a-7b(b)

90.    Plaintiff incorporates all preceding allegations of this Third Amended Complaint

as fully set forth herein.



117394.00601/30325789v.1

95. 

96.

97.

**WHEREFORE**, Plaintiff, James T. Monahan, acting on behalf of the United States of America demands that defendants ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ St. Francis Medical Center-Trenton, Liberty Medical Systems d/b/a Jersey City Medical Center and Meadowlands Medical Center, Barnert Hospital, Deborah Heart and Lung Center and Bayonne Hospital pay the United States of America the penalty of not less than $5,500 and not more than $11,000 per violation, three times the amount of damages which the United States of America has sustained because of the violation of the false claims act, plus litigation costs and reasonable attorneys fees, and other such relief as the court deems appropriate.

117394.00601/30325789v.1

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Civil Procedure, Plaintiff hereby demands a trial by

jury on all the issues.

BLANK ROME LLP
A Pennsylvania LLP
NICHOLAS C. HARBIST, ESQ. (NCH-7014)
New Jersey Resident Partner
LEV KALMAN, ESQ. (LK-3299)
Woodland Falls Corporate Park
210 Lake Drive East, Suite 200
Cherry Hill, New Jersey  08002
(856) 779-3600

MILLER, ALFANO & RASPANTI, P.C.
MARC S. RASPANTI, ESQ.
GAETAN J. ALFANO, ESQ.
1818 Market Street, Suite 3402
Philadelphia, PA  19103
Attorneys for Plaintiff/Relator,
James T. Monahan
(215) 972-6400

Dated: September ___, 2006

117394.00601/30299725v.1

## COUNT FOUR

### (Our Lady of Lourdes Medical Center)

98.    Plaintiff realleges and incorporates paragraph 1 through 97, as if fully set forth herein.

99.    As required by the FCA, 31 U.S.C. §3730(a)(2), the Relator has already provided to the Attorney General and to the United States Attorney for the District of New Jersey a statement of all material evidence and information related to this Complaint.  In addition, Relator has provided supplemental written materials to the Attorney General and the United States Attorney for the District of New Jersey.

100.    Relator is informed and believes that the pervasive false and fraudulent claims described herein began before he was made aware of them and continued up to and beyond the time the Relator filed his initial Complaint in this matter, on or about November 27, 2002.

101.    Relator James T. Monahan is an "original source" of the information giving rise to the herein cause of action pursuant to 31 U.S.C.A. §3730(e)(4)(A) because he is "an individual who has direct and independent knowledge of the information on which the allegations are based.

102.    Defendant, Our Lady of Lourdes Medical Center, is a New Jersey non-profit corporation with its principal place of business at 1600 Haddon Avenue, Camden, NJ  08103.

103.    Venue is appropriate in this district under 28 U.S.C. 139(b) and 31 U.S.C. § 3732 (a) since the plaintiff resides in this district and the corporate defendant Our Lady of Lourdes Medical Center conducts business in this district, and the claims arose in this district.

**Our Lady of Lourdes' Implementation of** ███████████ **Outlier Fraud Scheme**

███████████████████████████████

███████████████████████████████

26

117394.00601/30325789v.1



105.

108.

109.

110.

117394.00601/30325789v.1



111.

112.

113.

114.

115.



116.

117.

118.

119.

29



120. ███████████████████████████████████
████████████████████████████████████
███████████████████████████████

121. █████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
███████

122. ████████████████████████████████████
████████████████████████████████████
████████████████████████████

123. ███████████████████████████
████████████████████████████████████
██████████████

124. ██████████████████████████████████
████████████████████████████████████
█████████████████████████████



125. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮

126. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮

127. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

128. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮

129.    Our Lady of Lourdes Medical Center was enrolled in and/or participated in Federal health care programs, including but not limited to Medicare and TRICARE/CHAMPUS.

130.    During at least 2000 and 2001, Our Lady of Lourdes Medical Center submitted false and fraudulent claims predicated on numerous violations of the anti-kickback statute. The scheme resulted in large percentage increases in outlier payments as follows:

31

| Hospital | 2000 Outlier Revenue | 2001 Outlier Revenue | Percent Increase | 2001 Outlier % |
|---|---|---|---|---|
| Our Lady of Lourdes  Med Ctr. | $2,848,550 | $18,281,944 | 541.80% | 27.4% |

## Acuity Rates

131.   Acuity is a quantitative measure of a hospital's consumption of resources relative to the care it provides to its patients.  Accordingly, the lower the acuity level for a particular hospital, the fewer resources that hospital has consumed in treating its patients.  Conversely, a high acuity level indicates that a hospital has consumed a high level of resources in treating its patients.  Our Lady of Lourdes Medical Center had acuity rates as follows:

| Hospital | 2000 Acuity | 2001 Acuity | 2002 Acuity |
|---|---|---|---|
| Our Lady of Lourdes Medical Center | 1.8796 | 1.86747 | 1.85344 |

132.   According to analyses performed by the Relator, Our Lady of Lourdes Medical Center had low acuity rates and low case mix indexes.

133.   Accordingly, Our Lady of Lourdes Medical Center consumed a relatively low level of resources in their treatment of Medicare patients.  The high outlier payments received by Our Lady of Lourdes Medical Center and its false and fraudulent charges to Medicare could not be and were not justified by relatively high costs of Medicare patient treatment or long hospital stays.

134.   Based on information received by Relator, Our Lady of Lourdes Medical Center has charged and is charging Medicare patients more for treatment than non-Medicare patients.  The higher charges to Medicare than to non-Medicare patients were submitted in an effort to

32

receive high cost outlier payments from Medicare and in violation of Medicare regulations requiring all patients to be charged alike.

135.   In an effort to decrease the amount of income traceable or identifiable as being received from outlier payments, Our Lady of Lourdes Medical Center engaged in a reallocation in its financial statements where amounts listed for bad debt and other reserves were artificially inflated in order to give the false impression of a stable level of net income and profit.

136.   Our Lady of Lourdes Medical Center engaged in the artificial reallocation of its bad debt and other reserves with the intent of deceiving their investors, auditors or the United States Government and hiding the true amount of outlier income they were receiving.

137.   The artificial reallocation of bad debt reserves by Our Lady of Lourdes Medical Center was performed in an attempt to make it appear that it was receiving less net income than it actually was and in an effort to distract auditors and other government investigators from its excessive outlier income.

138.   Accordingly, Our Lady of Lourdes Medical Center may have, in actuality, received substantially greater outlier income than was reported by it in its financial statements.

139.   Based on artificially inflated charges, not consistently related to costs, Our Lady of Lourdes Medical Center submitted bills to CMS requesting outlier payments.  The request for outlier payments are false and fraudulent, in that the charges are not consistently applied to all payers and the charges have no accurate or legitimate relationship to actual costs incurred.

140.   The charges listed by Our Lady of Lourdes Medical Center and submitted to Medicare are fraudulent because they are not reasonably related to costs, are not uniformly applied to all patients, and do not reflect negotiated discounts traditionally given to other payers. Indeed, the sole reason Our Lady of Lourdes Medical Center inflated charges to Medicare and

33

other federal government agencies was to obtain outlier payments to which it was not legally entitled.

141.    Because Our Lady of Lourdes Medical Center discounts charges to private insurers but not to Medicare, the high cost outliers charged to Medicare are artificial and inflated and evidence an even greater abuse by Our Lady of Lourdes Medical Center in its charges to Medicare.  Indeed, the high cost outliers charged to Medicare cannot be accurately compared to the charges for private payers because the stated charges to private payers do not reflect their negotiated discounts.

142.    In furtherance of the outlier revenue fraud scheme, from in or about 1996 through in or about the present, Defendant Our Lady of Lourdes Medical Center knowingly presented, or caused to be presented to CMS, formerly known as the Healthcare Financing Administration, false and fraudulent claims for payment; and made, used, or caused to be made or used, false or fraudulent records or statements to get a false or fraudulent claim paid, all in violation of 31 U.S.C. Section 3729(a)(1) and (2).

143.    As a result of the revenue fraud scheme, Defendant Our Lady of Lourdes Medical Center defrauded the Department of Health and Human Services and the taxpayers of the United States out of hundreds of millions of dollars in outlier payments to which the defendants were not otherwise entitled.

**WHEREFORE**, Plaintiff, James T. Monahan, acting on behalf of the United States of America demands that defendant Our Lady of Lourdes Medical Center pay the United States of America the penalty of not less than $5,500 and not more than $11,000 per each False Claims Act violation, three times the amount of damages which the United States of America has

sustained because of the violation of the False Claims Act, plus litigation and investigation costs and reasonable attorneys fees, and other such relief as the court deems appropriate.

**COUNT FIVE**
**(Our Lady of Lourdes Medical Center)**

144.    Plaintiff incorporates all preceding allegations of this Complaint as fully set forth herein.

145.    Beginning in or about 1996 through in or about the present in the District of New Jersey and elsewhere, ▮▮▮▮▮▮▮▮ and others known and unknown, including Defendant Our Lady of Lourdes Medical Center, did knowingly conspire, combine, collude and agree to file and fraudulent claims for payment with the CMS and did use false records or statements to get a false or fraudulent claim paid, all in violation of 31 U.S.C. § 3729(a)(3).

146.    As a result of the cost outlier fraud conspiracy, Defendant Our Lady of Lourdes Medical Center defrauded the Department of Health and Human Services and the taxpayers of the United States out of hundreds of millions of dollars in outlier payments to which it was not otherwise legally entitled.

**WHEREFORE**, Plaintiff, James T. Monahan, acting on behalf of the United States of America demands that defendant Our Lady of Lourdes Medical Center pay the United States of America the penalty of not less than $5,500 and not more than $11,000 per each False Claims Act violation, three times the amount of damages which the United States of America has sustained because of the violation of the False Claims Act, plus litigation and investigation costs and reasonable attorneys fees, and other such relief as the court deems appropriate

**COUNT SIX**
**(Our Lady of Lourdes Medical Center)**

147.    Plaintiff incorporates all preceding allegations of this Complaint as fully set forth herein.

35

148.     Defendant Our Lady of Lourdes Medical Center violated 42 U.S.C. §1320a-7b(b)(2) because they knowingly and willfully paid remuneration to ███████████ in order to induce it to arrange for the furnishing and recommending of services in violation of 42 U.S.C. §1320a-7b(b)(2)(A) and (B).

149.     Medicare would not have reimbursed Defendant Our Lady of Lourdes Medical Center if it had known about ███████████ advice that the defendant hospitals submit and submitted false and fraudulent documents in order to obtain higher Medicare reimbursement.

150.     Medicare would not have reimbursed Defendant Our Lady of Lourdes Medical Center if it had known about ███████████ underlying violations of the anti-kickback statute.

151.     Defendant Our Lady of Lourdes Medical Center knew that the government would not have paid them had it known about ███████████ fraudulent scheme.

152.     The submission of thousands of claims for payment by Defendant Our Lady of Lourdes Medical Center contained false certifications that it was complying with federal health care laws and regulations, including the anti-kickback statute, when, in fact, it was not. Each failure of Defendant Our Lady of Lourdes Medical Center to announce their non-compliance with the anti-kickback statute constituted a violation of the False Claims Act.

117394.00601/30325789v.1

**WHEREFORE**, Plaintiff, James T. Monahan, acting on behalf of the United States of America demands that defendant Our Lady of Lourdes Medical Center pay the United States of America the penalty of not less than $5,500 and not more than $11,000 per violation, three times the amount of damages which the United States of America has sustained because of the violation of the false claims act, plus litigation costs and reasonable attorneys fees, and other such relief as the court deems appropriate.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Civil Procedure, Plaintiff hereby demands a trial by jury on all the issues.

MILLER, ALFANO & RASPANTI, P.C.
MARC S. RASPANTI, ESQ.
GAETAN J. ALFANO, ESQ.
1818 Market Street, Suite 3402
Philadelphia, PA  19103
Attorneys for Plaintiff/Relator, James T. Monahan
(215) 972-6400

Dated: ~~September~~ October 9, 2006