**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JAMES MONAHAN, | : : : | |
| Plaintiff, | : : | Civil Action No. 02-5702 (JAG) |
| v. | : : | **OPINION** |
| ROBERT WOOD JOHNSON UNIVERSITY HOSPITAL AT HAMILTON, | : : : : | |
| Defendant. | : : | |
| UNITED STATES OF AMERICA, *ex rel.* PETER SALVATORI, et al. | : : : | |
| Plaintiffs, | : : | Civil Action No. 08-1265 (JAG) |
| v. | : : | |
| ROBERT WOOD JOHNSON UNIVERSITY HOSPITAL AT HAMILTON, | : : : : | |
| Defendant. | : : | |

**GREENAWAY, JR., U.S.D.J.**

This matter comes before this Court on the motion to dismiss the Complaint by defendant

Robert Wood Johnson University Hospital at Hamilton, pursuant to FED. R. CIV. P. 12(b)(6), for

failure to state a claim upon which relief can be granted, and pursuant to FED. R. CIV. P. 9(b), for

failure to plead with particularity.   For the reasons set forth below, Defendant's motion to dismiss shall be denied.

## I.  BACKGROUND

Plaintiff is the United States of America (the "Government"), suing on behalf of the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA").  (Compl. at ¶ 4.)  CMS is a component of the United States Department of Health and Human Services ("HHS").  (Id.)  CMS is directly responsible for the administration of the Medicare program.  (Id. at ¶ 22.)

Defendant is Robert Wood Johnson University Hospital at Hamilton ("RWJHH").  (Id. at ¶ 5.)  RWJHH is a private, non-profit, acute care hospital based in Hamilton, New Jersey.  (Id.)  Defendant is a component of, and affiliated with, the Robert Wood Johnson Health Care Corp. at Hamilton, which itself is a component of the Robert Wood Johnson Health Care Corp. (Id.)  Defendant is also affiliated with Robert Wood Johnson University Hospital in New Brunswick, Robert Wood Johnson University Hospital at Rahway, and the Robert Wood Johnson Health Network, which consists of several acute care hospitals.  (Id.)

Relator James Monahan ("Relator Monahan") is an adult individual, who resides in the District of New Jersey.  (Id. at ¶ 6.)  Relator Monahan filed a qui tam complaint against Defendant on behalf of the United States, asserting status as a relator, under 31 U.S.C. § 3730(b)(2).  (Id.)  Relator Monahan states that he has knowledge of the violations and allegations discussed in the Complaint.  (Id.)

Relators Peter Salvatori and Sara C. Iveson ("Salvatori Relators") are adult individuals, who reside in Commonwealth of Pennsylvania.  (Id. at ¶ 7.)  The Salvatori relators filed a qui tam

complaint against Defendant on behalf of the United States, asserting status as relators under 31

U.S.C. § 3730(b)(2).  (Id. at ¶ 7.)   That action has been consolidated with the Monahan action.

The Salvatori relators state that they have knowledge of the violations and allegations discussed

in the Complaint. (Id.)

The United States seeks to recover outlier payments that Defendant obtained and kept

from the United States by submitting false or fraudulent claims.  (Id. at ¶ 8).  Outlier payments

are payments that the Medicare program makes to compensate hospitals for episodes of inpatient

care that are extraordinarily costly in relation to average or typical episodes of care.  (Id.)  The

Complaint alleges that Defendant knew that outlier payments were intended and authorized by

Congress only to compensate hospitals for extraordinary costs that substantially exceed the

amount of standard Medicare reimbursements.  (Id. at ¶ 9.)  Defendant intentionally manipulated

its charge structure to inflate its apparent costs for inpatient treatments.  (Id.)

Defendant fraudulently obtained and held many millions of dollars from the United States

in outlier payments for cases that either were not extraordinarily costly or were much less costly

than Defendant made them appear to be.  (Id. at ¶ 10.)  Defendant knew, within the meaning of

the False Claims Act ("FCA"), that it was not entitled to claim these outlier payments, that it was

not authorized to receive them, and that it was not authorized to keep them.  (Id.)   In order to

obtain these payments, Defendant rapidly increased its billed charges for providing medical care

far in excess of any increase in the costs associated with that care.  (Id. at ¶ 11.)   This practice is

known as "turbocharging."  (Id.)  Defendant knew that the Medicare program used hospital

charges as a proxy for costs, after adjusting those charges in accordance with a predetermined

formula.  (Id. at ¶ 12.)  Defendant also knew that by turbocharging, it could deceive the Medicare

program into believing that the costs associated with inpatient medical care that Defendant provided were higher than they actually were, and thereby obtain more outlier payments than Defendant was legally entitled to obtain.  (Id. at ¶ 13.)

The procedure by which hospitals obtain inpatient outlier payments is set forth in two regulations, 42 C.F.R. §§ 412.80 and 412.84 (collectively, "the Outlier Regulations").  (Id. at ¶ 39.)  In order to obtain an outlier payment, a hospital first must submit a standard claim form known as the UB-92, which includes what the hospital represents to the government are the actual charges for the services and supplies provided.  (Id. at ¶ 40.)  Section 2202.4 of CMS's Provider Reimbursement Manual (a manual created by CMS as guidance for providers participating in the Medicare program) defines charges as "the regular rates established by the provider for services rendered to both beneficiaries and to other paying patients and further provides that "[c]harges should be related consistently to the cost of the services and uniformly applied to all patients whether inpatient or outpatient."  (Id. at ¶ 41.)  Section 2405.5(B) of the Provider Reimbursement Manual states that "payment for cost outliers must be specifically requested by the hospital...."  (Id. at ¶ 43.)

To request an outlier payment, the hospital must omit a particular code, Condition Code 66, from the UB-92. (Id.)  According to the Medicare Hospital Manual, the omission of Condition Code 66 from the UB-92 is equivalent to a request by the hospital for "any possible outlier payment," and the inclusion of Code 66 on the UB-92 means that the hospital "do[es] not want to claim [a] cost outlier payment." (Id.)  In order to determine whether a particular inpatient stay was extraordinarily costly and thus merited an outlier payment, the system employs a fiscal intermediary ("FI").  The FI typically is a private insurance company that is responsible for

4

determining the amount of the payments to be made to hospitals and other providers.  In this

instance, the FI uses the hospital's charges (the amount billed to the patient), as shown on the

UB-92, as the starting point.  (Id. at ¶ 44.)  The FI then multiplies the charges from the UB-92 by

the cost-to-charge ratio, or "CCR" derived from the hospital's most recent settled cost report.

(Id.)  Typically, at least two to three years elapses between the time a hospital submits a cost

report to an FI and the time that cost report is settled.  (Id. at ¶ 51.)

Under the pre-August 2003 Outlier Regulations, the CCR used for the outlier payment

calculation was derived from the hospital's most recent settled cost report. (Id.)  Thus, the CCR

used by the FI to determine the hospital's costs for a particular inpatient stay typically was based

on cost and charge data that were at least two to three years old. (Id.)  As a result of the time lag,

a hospital could manipulate the outlier system by turbocharging.  (Id. at ¶ 54.)  By inflating its

charges without relation to its costs, which Defendant began doing at the end of 1997, Defendant

caused the FI to multiply the increased charges billed for an inpatient stay by a CCR that had not

yet been reduced to reflect the recent increase in charges resulting from the hospital's

turbocharging.  (Id.)  By taking advantage of the time lag, Defendant made it appear that the costs

associated with inpatient care were higher than they actually were, and thereby could obtain

outlier payments to which they were not entitled.  (Id. at ¶ 55.)

As a result of Defendant's turbocharging scheme, its outlier payments increased

geometrically, beginning in 1998, from less than a million dollars to more than $18 million

annually in only three years.  (Id. at ¶ 93.)  At the end of December 1997, Defendant

turbocharged to such a degree that its cost-to-charge ratio dropped to far below the norm for

hospitals in New Jersey and nationwide, reflecting the fact that its charges for services provided

to Medicare patients became unusually high relative to its costs.  (Id. at ¶ 16.)  Defendant

proceeded to turbocharge on various occasions during a 40 month period spanning all of 1998,

1999, 2000, and continuing through April 2001.  (Id.)  Defendant was aware that it was receiving

an outlier payment windfall.  (Id. at ¶ 94.)   In the Spring of 2001, Defendant finally decreased its

charges, and its outlier payments correspondingly dropped.  (Id.)  By the end of 2001,

Defendant's outlier payments were close to their 1997 levels.  (Id.)

   Defendant made false or fraudulent claims to the United States for payment or approval

because it engaged in a fraudulent scheme that resulted in its receipt of outlier payments that it

was not entitled to receive under either the Outlier Statute or the Outlier Regulations.  (Id. at ¶

133.)  Defendant presented, or caused to be presented, false or fraudulent claims with the

knowledge that they were false, and/or with deliberate ignorance of their truth or falsity, and/or

with reckless disregard for their truth or falsity.  (Id. at ¶ 134.)  Defendant submitted UB-92

claim forms, without including Condition Code 66, which meant that Defendant sought

reimbursement in all cases where Defendant's billed charges, adjusted to cost pursuant to the

formula set forth in the Outlier Regulations, exceeded the sum of standard Medicare

reimbursement plus the outlier threshold (the cutoff point).  (Id. at ¶ 137.)  Defendant's billed

charges, as set forth in its UB-92's, were not reasonably, consistently or otherwise rationally

related to Defendant's costs.  (Id.)

   In April 2008 the United States filed its Complaint, alleging violations of the False

Claims Act, 31 U.S.C. § 3729 et seq., and related common law claims.  Specifically, the four

count Complaint alleges that Defendant violated 31 U.S.C. § 3729(a)(1) when it presented

fraudulent claims to the United States for payment (Count I); Defendant violated 31 U.S.C. §

3729(a)(2) when it submitted false records/statements to the United States in order to get its

fraudulent claims paid (Count II); Defendant caused the United States to make unauthorized and

excessive outlier payments (payment by mistake of fact or law) (Count III); and Defendant was

unjustly enriched by its receipt and retention of unlawful Medicare outlier payments (Count IV).

## II.  JURISDICTION AND VENUE

This Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1345 and 31 U.S.C. §

3730(a). Venue is proper is the District of New Jersey under 31 U.S.C. § 3732(a) and 28 U.S.C. §

1391(b).  Defendant is located and transacts business in the District of New Jersey, and the

events and omissions giving rise to the claims alleged in the Complaint occurred in the District of

New Jersey.

## III.  STANDARD OF REVIEW

### (A) FED. R. CIV. P. 12(b)(6)

A complaint should be dismissed only if the alleged facts, taken as true, fail to state a

claim.  See In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 397-98 (3d Cir. 2000).  The

question is whether the claimant can prove any set of facts consistent with his allegations that

will entitle him to relief, not whether that person will ultimately prevail.  Scheuer v. Rhodes, 416

U.S. 232, 236 (1974); Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000).

A Rule 12(b)(6) motion to dismiss should be granted only if the plaintiff is unable to

articulate "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v.

Twombly, 127 S. Ct. 1955, 1974 (2007); see also In re Warfarin, 214 F.3d at 397 (stating that a

complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim

showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Twombly, 127 S. Ct. at 1964 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 1964-65 (internal citations omitted); see also FED. R. CIV. P. 8(a)(2).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Twombly, 127 S. Ct. at 1965 (internal citations omitted).  "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'"  Kost v. Kozakewicz, 1 F.3d 176, 183 (3d Cir. 1993) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure Civil 2d § 1357 at 340) (2d ed. 1990).

    A court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party.  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384-85 (3d Cir. 1994); see also Sturm v. Clark, 835 F.2d 1009, 1011 (3d Cir. 1987).  While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations.  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 n.8 (3d Cir. 1997). "The defendant bears the burden of showing that no claim has been presented."  Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).

8

In reviewing a motion to dismiss, pursuant to Rule 12(b)(6), a court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record.  Pittsburgh v. W. Penn Power Co., 147 F.3d 256, 259 (3d Cir. 1998); see also 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure: Civil 3d § 1357 (3d ed. 2007).  "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

**(B) FED. R. CIV. P. 9(b)**

In pleading fraud, FED. R. CIV. P. 9(b) establishes a heightened pleading standard by requiring that "the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." "Rule 9(b)'s heightened pleading standard gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements."  Burlington Coat, 114 F.3d at 1418 (citations omitted).  Rule 9(b) "requires plaintiffs to plead 'the who, what, when, where, and how: the first paragraph of any newspaper story.'"  In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)). "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'"  In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (quoting In re Nice Sys., 135 F. Supp. 2d 551, 577 (D.N.J. 2001)).  "[I]n applying Rule 9(b), courts should be 'sensitive' to situations in which

9

'sophisticated defrauders' may 'successfully conceal the details of their fraud.'" Id. (quoting

Burlington Coat, 114 F.3d at 1418). "Where it can be shown that the requisite factual

information is peculiarly within the defendant's knowledge or control, the rigid requirements of

Rule 9(b) may be relaxed." Id.

## IV.  ANALYSIS

### A)        Government's FCA Claims

The False Claims Act provides, in relevant part: "Any person who - (1) knowingly

presents, or causes to be presented, to an officer or employee of the United States Government or

a member of the Armed Forces of the United States a false or fraudulent claim for payment or

approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to

get a false or fraudulent claim paid or approved by the Government . . .  is liable to the United

States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3

times the amount of damages which the Government sustains because of the act of that person."

31 U.S.C. § 3729(a).

"To establish a prima facie claim under 31 U.S.C. § 3729(a)(1), a plaintiff must show

that: "(1) the defendant presented or caused to be presented to an agent of the United States a

claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim

was false or fraudulent." U.S. ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 242 (3d Cir. 2004).

In order to prove a claim under § 3729(a)(2), a plaintiff must also show that the defendant made

or used (or caused someone else to make or use) a false record in order to cause the false claim to

be actually paid or approved.  Id.

Defendant argues that the Government has failed to state a claim for violation of the FCA

because the Government fails to allege that any of Defendant's claims for reimbursement were false or fraudulent within the meaning of the FCA.  Defendant contends that its charge structure was permitted by the applicable Medicare regulations and therefore the Government cannot identify any false claim submitted by RWJUHH.  According to Defendant, the Government can identify no statute or regulation that limits a hospital's entitlement to outlier payments based on "high charges."  Defendant argues that the claims as submitted were based on Defendant's actual charge structure and reflect accurate claims based on charges for services provided by Defendant for inpatient services.

Defendant also states that the Government has failed to plead its FCA claims, with particularity, as required by FED. R. CIV. P. 9(b).  Defendant states that while the Government's Complaint incorporates thousands of purported claims that allegedly were submitted to the United States, it does not explain how any particular claim is false nor does it provide a factual basis from which one might distinguish legitimate claims or charges from allegedly false or fraudulent ones.

In the Complaint, the Government alleges that Defendant submitted false claims to the Medicare program, which resulted in outlier payments from January 1998 to April 2001. (Compl. at ¶ 133.)  "Each UB-92 claim submitted, or caused to be submitted, by the Defendant to the Medicare program, which resulted in an outlier payment during the period from January 1998 through April 2001. . . constitutes a false claim presented to the United States for payment or approval because Defendant engaged in a fraudulent scheme that resulted in its receipt of outlier payments it was not entitled to receive under either the Outlier Statute or the Outlier regulations. (Id.)  Defendant submitted forms to the Medicare program for payment which satisfies the first

prong of the prima facie test under § 3729(a)(1) of the FCA.

The Government alleges that on or about December 30, 1997, Defendant began a scheme known as turbocharging.  (Compl. at ¶ 64.)  In a turbocharging scheme, a Defendant rapidly increases its billed charges for providing medical care far in excess of any increase in the costs associated with that care in order to obtain increased "outlier" payments from the Medicare program.  (Id. at ¶ 11.)  The Government alleges that Defendant fraudulently obtained and held many millions of dollars from the United States in outlier payments that either were not extraordinarily costly or were much less costly than Defendant made them appear to be.  (Id. at ¶ 10.)  "This is reflected in the dramatic decrease in the hospital's CCR, which equates to a sharp increase in its charges relative to its costs." (Id.)  The Complaint alleges that the increases in Defendant's charges bore no rational relationship to increases in Defendant's actual costs. "...Defendant's Medicare cost reports indicate that Defendant's total Medicare inpatient charges increased by more than 290% from 1997 to 2000 (from $34.5 million to $135.2 million), whereas Defendant's Medicare inpatient costs increased during that period by only 32% (from $16.3 million to $21.5 million.)"  (Id. at ¶ 72.)

The Complaint further alleges that Defendant deceived the Medicare program into believing that the costs associated with inpatient medical care that Defendant provided were higher than they actually were, and therefore obtained more outlier payments than Defendant was legally entitled to claim.  (Id. at ¶ 13.)  Since the Medicare program used hospital charges as a proxy for costs, after adjusting those charges based on a complex formula, manipulating the charges would convince the Government that Defendant's costs were higher which would result in higher payments for reimbursement. (Id. at ¶¶ 12-13.)

The relevant Medicare statute, 42 U.S.C. § 1395ww(d)(5)(A)(ii), provides that a hospital "may request additional payments in any case where charges, adjusted to cost, exceed a fixed multiple of the applicable DRG prospective rate...."  The statute provides further that "The amount of such additional payment under clauses (i) and (ii ) shall be determined by the Secretary and shall . . . approximate the marginal cost of care beyond the cutoff point applicable under clause (i) and (ii)."  Furthermore, CMS regulations promulgated under 42 U.S.C. § 1395ww track the language in the statute, thus providing additional support for the notion that outlier charges were intended to be correlated to the cost of treatment.  Specifically, 42 C.F.R. § 412.80, which governs outlier cases, provides "CMS provides for additional payment, beyond standard DRG payments, to a hospital for covered inpatient hospital services furnished to a Medicare beneficiary if the hospital's charges for covered services, adjusted to operating costs and capital costs by applying cost-to-charge ratios, as described in § 412.84(h), exceed the DRG payment for the case . . ."

As alleged in the Complaint, Defendant's claims submitted to the Government that were not "adjusted to costs", which the medicare statutes and regulations anticipate, and were the result of grossly exaggerated charges designed to increase payments from the Government that were out of step with increases in Defendant's costs, are suggestive of fraud.[1]  As the Third

_____

[1] On April 14, 2009, Defendant filed a motion to amend this Court's order of March 31, 2009 and to seek an order to certify an appeal, pursuant to 28 U.S.C. § 1292(b).  Defendant asks this Court to reconsider its decision on the basis of the Third Circuit's holding in United States ex rel. Quinn v. Omnicare, Inc., 382 F.3d 432 (3d Cir. 2004).  Defendant cites Quinn for the proposition that health care providers cannot be found liable under the FCA for submitting claims to the government that are permitted by applicable laws and regulations.  In Quinn, the Third Circuit upheld the district court's grant of summary judgment in favor of pharmacies alleged to have submitted fraudulent claims for medicare reimbursement under §§ 3729(a)(1), (2), and (7) of the FCA. Quinn, 382 F.3d at 438.  The defendant pharmacies submitted forms for

13

Circuit has explained,  "The terms "false" and "fraudulent" are not defined in the FCA.  The terms, however, do have independent meanings: A common definition of "fraud" is an intentional misrepresentation, concealment, or nondisclosure for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right." "False" can mean "not true," "deceitful," or "tending to mislead."  The juxtaposition of the word "false" with the word "fraudulent," plus the meanings of the words comprising the phrase "false claim," suggest an improper claim is aimed at extracting money the government otherwise would not have paid." Quinn, 382 F.3d at 438 (3d Cir. 2004).

In the Complaint the Government indicates that Defendant filed claims based on

---

reimbursement to the New Jersey Medicaid program for medication dispensed to qualified beneficiaries who later returned the medication.  They later repackaged and resold the returned medication, reimbursing Medicaid for only 50% of the reimbursement amount paid by Medicaid. The Quinn plaintiff, a relator, alleges that the initial claims for reimbursement were false due to the failure of the defendant pharmacies to adjust those claims when the medications were returned for recycling. Id.  The Third Circuit upheld the district court's finding that the defendant pharmacies were not required by statute or regulation to amend a claim that had been previously submitted once the medication has been returned.  Id.  The Third Circuit explained the basis for its conclusion as follows: "the fallacy of [plaintiff's] argument lies in the fact that the return of a medication, which at the outset has been dispensed to a Medicaid beneficiary, does not render the initial claim false or fraudulent." Id.  In addition, the Third Circuit concluded that it "would be exceeding the intent of Congress in defining false claims if we were to permit the transforming of a valid claim into a false claim by the occurrence of a subsequent fortuitous event which is not itself the basis any required adjustment." Id. at 439.  This Court finds the Third Circuit's holding in Quinn to be inapposite.  In this case, this Court has determined that the Medicare statutes and regulations in question explicitly require that there be a correlation between costs and charges. The applicable statute 42 U.S.C. § 1395ww(d)(5)(A)(ii), provides that a hospital "may request additional payments in any case where charges, adjusted to cost, exceed a fixed multiple of the applicable DRG prospective rate...."  Armed with a statute and interpretive regulations that specifically state that charges be "adjusted to cost", the Government, in this case, is able to state a claim for fraud under the FCA whereas in Quinn the Third Circuit determined that no statute or regulation imposed liability on pharmacies for failure to amend their claims for reimbursement.

increased charges as part of a scheme to defraud the Medicare program.  Based on the allegations within the Complaint, the Government has pled facts which demonstrate non-disclosure and intentional misrepresentation, which are hallmarks of "fraud".  According to the facts alleged in the Complaint, Defendant intentionally filed claim statements based on charges that were unrelated to costs, in violation of the applicable Medicare statutes and regulations, and did not disclose to the Government that it had drastically increased its charges, which might lead to payments that were at odds with the clear intent and purpose of the outlier program.

The Government has identified a broad time period in which Defendant filed claims based on a charge structure that was unrelated to costs.  The facts contained in the Complaint give the Defendant sufficient notice as to the conduct that the Government alleges violated the False Claims Act.

This Court finds that the Government's Complaint meets the statutory requirement of fraud under the FCA and satisfies the second prong of prima facie case required by the Third Circuit.  This Court also finds that the Government's allegations of fraud are stated with sufficient particularity to give Defendant notice of Plaintiff's claims and meet the pleading requirements under FED. R. CIV. P. 9(b).

This Court also finds that the Government has met the third prong of the prima facie case, as required by the Third Circuit, to state a claim for violation of § 3729(a)(1) of the FCA.  The Government has alleged that Defendant engaged in a scheme designed to defraud the Government, and knew that its submissions for payment for reimbursement under the outlier program were fraudulent.  "The Defendant knew that outlier payments were intended and authorized by Congress only to compensate hospitals for extraordinary costs that substantially

15

exceed the amount of standard Medicare reimbursements.  The Defendant nevertheless intentionally manipulated its charge structure to inflate its apparent costs for inpatients treatments." (Compl. at ¶ 9).

The Complaint alleges that Defendants violated  § 3729(a)(2) when Defendant failed to include Condition Code 66 when it submitted UB-92 claim forms, which constituted a false record submitted to get a false or fraudulent claim approved.  The inclusion of Condition Code 66, presumably, would have enabled the Government to distinguish ineligible claims with inordinately high charges so that the Government would not reimburse those claims at the outlier rate.  "By omitting the inclusion of Condition Code 66, the Defendant's UB-92 claim forms constituted claims for outlier payments in all cases where the Defendant's billed charges, adjusted to cost pursuant to the formula set forth in the Outlier Regulations, exceeded the sum of standard Medicare reimbursements plus the outlier threshhold (the cutoff point.)" (Compl. at ¶ 137.)

The claims, as submitted, were not reasonably related to the Defendant's costs.  "In fact, these charges were set so that, when run through the regulatory formula used to determine outlier payments, these charges (a) would *not* be meaningfully adjusted to the Defendant's costs so as to reasonably reflect Defendant's actual costs, (b) would grossly exaggerate those actual costs, and (c) would result in outlier payments that exceeded any reasonable approximation of the marginal cost of care above the cutoff point."  (Id.)

This Court finds that the Government has stated a claim for violation of § 3729(a)(2) of the False Claims Act.

16

**B)      Payment By Mistake**

"The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid.  'No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute." U.S. v. Wurts, 303 F.3d 414, 415 (1938).  The right to sue is inherent in the Government's power to disburse or dispose of the property of the United States.  See United States v. Lahey Clinic Hosp., Inc. 399 F.3d 1, 15-16, n.16 (1st Cir. 2005).

As alleged in the Complaint, the Government paid Defendant for claims that were the result of a fraudulent scheme to obtain additional funds from the government.  Defendant argues that the Government's payment by mistake claim must fail because the allegations in the Complaint demonstrate that the payments were properly owed.  Essentially, Defendant argues that the Government's payment by mistake claim fails because the Complaint does not sufficiently plead fraud and therefore Defendant was entitled to receive the payments the Government paid to it.  This Court disagrees.  The Government has stated a claim for fraud under the False Claims Act.  The Government is entitled to sue to recoup monies that were paid illegally, as a result of alleged fraud.

This Court finds that the Government has stated a claim for payment by mistake.

**C)      Unjust Enrichment**

A claim of unjust enrichment requires the plaintiff to "show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that would be unconscionable for the party to retain without compensating the provider." Ankerstjerne v. Schlumberger, Ltd.,155 F. App'x. 48, 52 (3d Cir. 2005).

17

The Complaint alleges that Defendant engaged in a fraudulent scheme to exaggerate charges for patient care, which resulted in the Government reimbursing Defendant for millions of dollars of charges, which exceeded what Defendant was entitled to under the Medicare program's outlier statute and regulations. (Compl. at ¶ 137.)   Defendant argues that because the Government has failed to state a claim for fraud under the FCA, its unjust enrichment claim must also fail.  Defendant maintains that it was entitled to the monies it received because it acted lawfully.  This Court disagrees.  The Government has adequately stated a claim for fraud under the FCA and therefore can state properly a claim for unjust enrichment by alleging that the payments it made to Defendant were "wrongfully secured" by Defendant as a result of Defendant's fraud.

This Court finds that the Government has stated a claim for unjust enrichment.

**D)      Statute of Limitations**

The statute of limitations under the FCA is contained in 31 U.S.C. § 3731(b), which provides, "(b) A civil action under section 3730 may not be brought--

(1) more than 6 years after the date on which the violation of section 3729 is committed, or

(2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last."

The relators in this case filed their qui tam actions in November 2002, concerning the alleged fraud committed by Defendant between 1997 and 2001.  Therefore, the qui tam actions were filed within the statute of limitations period.  The Government's Complaint relates back to

the Monahan Relator's and Salvatori Relators' original complaints, which were timely filed. FED. R. CIV. P. 15(c)(1)(A) and (B) provide "An amendment to a pleading relates back to the date of the original pleading when:  (A) the law that provides the applicable statute of limitations allows relation back; (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading."

Defendant argues that the Government's claims are time-barred because the Government's claims do not relate back to the original qui tam Complaints filed by the relators. Defendant cites to U.S. v. Baylor Univ. Med. Ctr, 469 F.3d 263, 270 (2d Cir. 2006) for the proposition that the Government's complaint in intervention does not relate back to the original qui tam complaints filed by the relators.  Several courts have interpreted Rule 15 and its relationship to the FCA differently, and this Court declines to follow Baylor.

"Moreover, notwithstanding Baylor, Rule 15(c)(1) authorizes relation back where the law that provides the statute of limitations applicable to the action permits. FED. R. CIV. P. 15(c)(1). "[I]f that law affords a more forgiving principle of relation back than the one provided in this rule, it should be available to save the claim." FED. R. CIV .P. 15 Advisory Committee's Note.  Certain characteristics of the FCA demonstrate it is one such law.  Specifically, the FCA requires relators to file their complaints under seal and to then stand idly by while the Government investigates the alleged fraud. 31 U.S.C. § 3730(b) (2008).  By its terms, at least, the statute places no limitation on the duration of the Government's investigation: though initially limited to sixty days, a district court can extend the investigation period for good cause shown.  Id.  The Government may intervene at any time before this investigation period ends.  Id.  Moreover, nothing in the FCA otherwise limits the Government's ability to seek redress for related, fraudulent conduct it uncovers during its investigation, whether or not it satisfies Rule 15(c)(2).  As seen in this very case, this leniency poses practical problems, but one cannot deny that the FCA purposefully affords the Government great latitude to conduct a thorough--and if necessary, lengthy--investigation before filing its complaint.  Based on this rationale, at least one other district court has held that Government complaints in intervention relate back to the filing date of the relator's original, sealed complaint under Rule 15(c)(1)."  Miller v. Holzmann, 563 F. Supp. 2d 54, 140 (D.D.C. 2008).

See also  United States ex rel. Ven-A-Care of the Fla. Keys, Inc. v. Dey, Inc., 498 F. Supp. 2d

389, 397-99 (D. Mass. 2007) ("Many courts have taken the view that a complaint-in-intervention

should be treated as an amended complaint under FED. R. CIV. P. 15.  See, e.g., United States ex

rel. Purcell v. MWI Corp., 254 F. Supp. 2d 69, 75 (D.D.C. 2003) (stating that "the Government's

complaint in intervention is an amendment of the relator's complaint" under Rule 15).  Although

the United States typically files its own complaint-in-intervention, nothing in the FCA requires a

complaint-in-intervention.  Instead, the United States could elect to intervene by simply using the

relator's complaint.")

The False Claims Act, which provides the applicable statute of limitations, allows for the

government's Complaint to relate back to the relators' claims, which were brought in 2002, well

within the 6 year statute of limitations.

The Government's common law claims for unjust enrichment also fall within the

applicable statute of limitations period.  28 U.S.C. § 2415(a) governs these common law claims.

Section 2415(a) provides: "Subject to the provisions of section 2416 of this title, and except as

otherwise provided by Congress, every action for money damages brought by the United States

or an officer or agency thereof which is founded upon any contract express or implied in law or

fact, shall be barred unless the complaint is filed within six years after the right of action accrues

or within one year after final decisions have been rendered in applicable administrative

proceedings required by contract or by law, whichever is later...."  28 U.S.C. § 2415(a).

The Government's common law claims for payment by mistake and unjust enrichment

relate back to the filing of the original qui tam complaint and are thus timely.  See United States

ex rel. Cambell v. Lockheed Martin Corp., 282 F. Supp. 2d 1324, 1336 (M.D. Fla. 2003)

("As long as the amended complaint refers to the same transaction or occurrence that formed the basis for the original complaint and the defendant was put on notice of the claim by the first complaint, there will be no bar to amendment; even new defendants and new theories of recovery will be allowed.")

## V. <u>CONCLUSION</u>

For the reasons stated above, Defendant's motion to dismiss the Complaint, pursuant to FED. R. CIV. P. 12(b)(6) and FED. R. CIV. P 9(b) shall be denied.

 S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.

Dated:  May 6, 2009